UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROSALIND ARNWINE**,                          Case No. 1:12 CV 1483

        Plaintiff,                          Magistrate Judge James R. Knepp II

   v.                          MEMORANDUM  OPINION  AND
                          ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Rosalind Arnwine seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

Procedural History

On November 10, 2008, Plaintiff filed applications for SSI and DIB stating she was disabled due to disc herniations and constant pain following a workplace accident. (Tr. 96, 158). She alleged a disability onset date of September 26, 2007. (Tr. 96, 102). Her claims were denied initially (Tr. 56–60) and on reconsideration (Tr. 56–59, 65). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 68). Born August 17, 1967, Plaintiff was 43 years old when the hearing was held on September 24, 2010. (Tr. 31, 96). Plaintiff – not represented by counsel – and

a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 24–25, 31–55).

Vocational History and Reports to the Agency

Plaintiff graduated from high school and her past work included jobs as a factory assembler and bus driver. (Tr. 159, 327). She reported she was in constant pain and sometimes could not get out of bed. (Tr. 158). She further stated she took many medications and did not drive because she took narcotics. (Tr. 158). Additionally, Plaintiff reported she could not sit for long periods, could not lift more than five to ten pounds, had poor memory and concentration, was always tired, had trouble sleeping and performing a number of physical activities, and was depressed. (Tr. 158, 180, 182).

Plaintiff lived in a house with her family. (Tr. 179). She said she exercised in the morning and went to doctor appointments throughout the week. (Tr. 180). Additionally, Plaintiff said she took care of her son and completed household chores such as cooking, washing dishes, vacuuming, ironing, and doing laundry, though she said someone carried the laundry for her. (Tr. 180–81). She explained her sons cared for her when her back and neck were hurting. (Tr. 180). Plaintiff expressed some difficulty dressing and doing her hair when she was in pain. (Tr. 180). She said she could cook frozen dinners and sandwiches, and explained she could pay bills but could not use a checkbook or handle a savings account anymore. (Tr. 180–81). She did not indicate trouble following instructions or getting along with authority figures, but said she sometimes had trouble dealing with stress, did not like crowds, and did not handle changes in routine well. (Tr. 183–84). Later, Plaintiff reported her condition had worsened, began to report shooting pains in her legs, and said she could not go to the doctor because she lacked insurance. (Tr. 196, 203).

2

Medical History

Plaintiff was injured at work on September 26, 2007, when she tripped over a coworker's foot, fell, hit her chin and forehead on the floor, and briefly lost consciousness. (Tr. 228, 246). She reported she called her son, who drove her to the Euclid Hospital emergency room, where she was x-rayed and given injections. (Tr. 246). On October 2, 2007, Plaintiff began treating with chiropractor Dr. Adam Rutkowski for neck and mid-back pain resulting from her workplace injury, reporting daily activity worsened her pain. (Tr. 229).

Plaintiff presented to Dr. Pogorelec on December 7, 2007 and recounted her workplace accident, stating her son drove her to the hospital, where a nurse gave her an injection and medication. (Tr. 275). X-rays showed no fractures or abnormalities. (Tr. 275). Plaintiff complained of lower back pain, right shoulder pain, and difficulty walking short distances. (Tr. 275). She was in pain during range of motion testing. (Tr. 274). Dr. Pogorelec prescribed medication and requested authority for trigger point injections. (Tr. 274). Plaintiff returned on December 21, 2007, having been approved for the injections. (Tr. 273). She was doing well and had a normal neurological exam but experienced pain in her neck and shoulder on range of motion testing. (Tr. 273). On January 4, 2008, Plaintiff saw Dr. Pogorelec and reported back pain after spending ten hours in a car driving to Alabama. (Tr. 272). She said she still had neck and back pain despite continued physical therapy. (Tr. 272). Plaintiff's range of motion testing was normal. (Tr. 272).

On January 30, 2008, Dr. Matthew E. Levy summarized Plaintiff's medical history for the Bureau of Workers' Compensation (BWC). (Tr. 246). Plaintiff told him she followed up with a number of doctors after her accident. (Tr. 246). She said her right shoulder was beginning to feel better, but she continued to have problems with her lower back and pain and tingling in her right

thigh. (Tr. 246). She also reported she could only walk two to three minutes at a time and had difficulty sleeping through the night. (Tr. 246).

Plaintiff ambulated with a normal gait, but appeared somewhat uncomfortable. (Tr. 247). There was "a focus of pain" at about the thoracolumbar junction and at the right-sided trapezius muscle belly. (Tr. 247). She could forward flex to approximately 80 degrees with about 30 degrees extension; demonstrated 30 degrees lateral bend bilaterally; and demonstrated 80 degrees lateral rotation bilaterally. (Tr. 247). Plaintiff's upper and lower extremity motor strength was 5/5, her reflexes were symmetric, and she performed sitting straight leg raises to 110 degrees bilaterally. (Tr. 247). In the supine position, she could straight leg raise to 40 degrees on the right and 80 degrees on the left. (Tr. 247). Dr. Levy did not recommend further diagnostic services and thought Plaintiff should be advanced into a more active physical therapy component, possibly focusing on vocational rehabilitation. (Tr. 247). He felt she could return to a light duty job but was not ready to return to operating heavy machinery such as a school bus. (Tr. 247).

Plaintiff saw Dr. Pogorelec on February 1, 2008 and complained of burning pain in her back and right shoulder. (Tr. 271). Plaintiff's medications were refilled and notes stated Plaintiff needed authority for a series of trigger point injections. (Tr. 271). On February 27, 2008, an MRI of Plaintiff's lumbar spine revealed a central disc herniation at L5-S1 with no foraminal compromise or thecal sac stenosis. (Tr. 249). An MRI of her cervical spine showed concentric disc bulging at C4-C5, right central disc herniation at C5-C6, right foramen stenosis at C5-C6, and straightening of the normal cervical lordosis. (Tr. 363–64). On May 9, 2008, Dr. Pogorelec noted Plaintiff had pain and a restricted range of motion in her cervical spine, along with increased pain and stiffness. (Tr. 270). Plaintiff saw Dr. Pogorelec again on May 23, 2008 and said she was feeling better, but she

4

complained of lower back pain and had swelling in her right leg. (Tr. 269). She told Dr. Pogorelec she had been laid off from work indefinitely. (Tr. 269).

On April 28, 2008, Plaintiff's chiropractor Dr. Rutkowski recommended amending Plaintiff's BWC claim to include the cervical and lumbar disc herniations at C4-5, C5-6, and L5-S1 because he believed the conditions resulted from her workplace injury. (Tr. 230). On June 20, 2008, Dr. Oscar F. Sterle reviewed Plaintiff's medical records and opined the disc herniations probably represented early onset degenerative spinal disease and were not the result of her accident. (Tr. 227). The BWC ultimately denied Plaintiff's request to add the disc herniations to her claim. (Tr. 224).

On June 20, 2008, Plaintiff told Dr. Pogorelec she was not feeling better. (Tr. 268). She said she could not get her medications filled due to a pharmaceutical drug lock on her BWC case. (Tr. 268). She was in pain but tolerated range of motion testing. (Tr. 268). Plaintiff complained of discomfort in her lumbar and cervical spine regions on July 25, 2008. (Tr. 267). Despite her painful muscle sprain, Plaintiff tolerated range of motion testing in her spine. (Tr. 267). She was given Ketoprofen and Vicodin. (Tr. 267).

On August 8, 2008, Plaintiff saw Dr. Sherif Salama and complained of pain on the right side of her neck and left side of her lower back. (Tr. 366). She described pain radiating down her right arm and the back of her legs, dizziness, tingling, swelling, decreased activities of daily living, and difficulty sleeping. (Tr. 366). Plaintiff was in no acute distress, with normal sensation and reflexes. (Tr. 368). She had tenderness at the right paravertebral area, decreased cervical spine range of motion, and painful right-side head turning, but no focal neurological deficit. (Tr. 368). Dr. Salama diagnosed a cervical sprain and prescribed steroid injections and medications. (Tr. 368).

On September 8, 2008, Plaintiff returned to Dr. Salama and complained of right-side neck

pain and left-side lower back pain, explaining her pain radiated to the back of her legs and down her right arm. (Tr. 276). Plaintiff also reported swelling in her hands, decreased activities of daily living, and difficulty sleeping. (Tr. 277). She was alert, oriented, and in no acute distress. (Tr. 277–78). Her musculoskeletal examination showed strength was 4/5 and her hand grip was 5/5 bilaterally. (Tr. 279). She exhibited tenderness at the right paravertebral area, decreased cervical spine range of motion, and painful right-side head turning, but no focal neurological deficit. (Tr. 279). Plaintiff was diagnosed with a cervical sprain, prescribed medication, and Dr. Salama planned to perform cervical epidural steroid injections. (Tr. 279). Plaintiff received an injection on September 15, 2008, tolerated the procedure well, and her condition was improved on discharge. (Tr. 282).

On September 15, 2008, Dr. Donald Sherman found that "with regard to the allowed conditions" in Plaintiff's workers' compensation claim – that is, *not* including her cervical and lumbar disc herniations – she had reached maximum medical improvement. (Tr. 109). He summarized the history of her injury, noting she was treated at the emergency room and followed up the next day with a physician's assistant, "who told her to stay off work for four days and then return to the clinic." (Tr. 284). Four days later, the same physician's assistant told her she should be all right to go back to work on light duty with a lumbar air seat for comfort. (Tr. 284). The following day, Plaintiff was referred to chiropractor Dr. Rutkowski. (Tr. 284). Dr. Sherman reported Plaintiff's lower back pain intensified in 2008 and she began experiencing shooting pain from her right shoulder into her right arm. (Tr. 284). Plaintiff said trigger point injections had not provided any relief, and she told Dr. Sherman she had not experienced any improvement despite weekly therapy with Dr. Rutkowski and home exercises. (Tr. 284). She said she had not returned to work because her employer had no light duty positions available. (Tr. 284).

6

Plaintiff was in no distress, with moderate tenderness over her posterior cervical muscles and moderate-to-marked tenderness over the right lateral trapezius and rhomboid muscle areas. (Tr. 285). Her cervical spine movements were extremely guarded, and all ranges of motion were limited and evoked pain. (Tr. 285). Plaintiff's reflexes were normal and symmetrical, but there was pain-related weakness in her right shoulder and she developed tingling in her neck and right arm during testing for Phalen's sign. (Tr. 285). Despite mild tenderness in her right lower thoracic musculature, Plaintiff's upper back was generally unremarkable. (Tr. 285). She had progressively increasing moderate-to-severe tenderness over her lumbar spine and mild-to moderate tenderness in her lumbar musculature. (Tr. 285). Additionally, Plaintiff's lumbar spine movement was moderately guarded. (Tr. 285–86). There was no indication of atrophy in Plaintiff's legs, but there was mild weakness (4/5) in her lower extremities. (Tr. 286). Plaintiff's stance and gait were normal. (Tr. 286).

Dr. Sherman reviewed Plaintiff's medical treatment related to her accident and determined her ongoing and additional symptoms were related to conditions not allowed in her claim. (Tr. 109, 286–87). Considering only the allowed conditions, he found she had reached maximum medical improvement and could return to her former position without restrictions. (Tr. 287). The BWC terminated temporary total disability in December 2008. (Tr. 221).

Plaintiff received another cervical epidural steroid injection on September 22, 2008. (Tr. 289). She tolerated the procedure well and her condition was improved at discharge. (Tr. 289). On October 3, 2008, she saw Dr. Salama for pain management treatment and told him she could no longer use Flexeril due to an allergic reaction. (Tr. 304). Plaintiff returned to Dr. Salama on October 6, 2008 to follow up on neck pain. (Tr. 306). She was alert, oriented, and in no acute distress, with 5/5 hand grip. (Tr. 307). Dr. Salama adjusted her medications and recommended trigger point

injections at her trapezius muscle. (Tr. 307). On November 3, 2008, Plaintiff complained of severe pain throughout her entire back, which she said radiated down her right arm and legs. (Tr. 316). She said nothing helped her pain. (Tr. 316). Additionally, Plaintiff reported decreased activities of daily living and said she could not fall asleep due to pain. (Tr. 317). Plaintiff was alert, oriented, and in no acute distress. (Tr. 317). Dr. Salama identified some trigger points at her left trapezius muscle, but Plaintiff's neurological examination was normal. (Tr. 318). Plaintiff's cervical, thoracic, and lumbosacral spine regions were tender, and she had a limited, painful range of motion in her lumbosacral spine. (Tr. 318). Plaintiff's lumbosacral spine also exhibited positive Ganselen's signs bilaterally. (Tr. 318). Dr. Salama diagnosed a lumbar strain and cervical and thoracic sprains. (Tr. 318). He noted Plaintiff should consider lumbar injections and refilled her prescriptions. (Tr. 318).

Chiropractic and Physical Therapy

Plaintiff began treating with chiropractor Dr. Rutkowski shortly after her injury, on October 2, 2007. (Tr. 362). She was in pain, with spasms, swelling, restricted range of motion, decreased strength, antalgic posture, and guarding, and she rated her pain as 8/10. (Tr. 358). Plaintiff treated with Dr. Rutkowski and others at his office several times a week through November 2008. She received massage therapy on October 10, 2007 and complained of back pain. (Tr. 365). Her trapezius was very tight, but tension decreased slightly after therapy. (Tr. 365). She complained of neck pain on October 22, 2007 and stopped her massage session early due to pain. (Tr. 365). On October 26, 2007, she complained of lower back pain and did not want a full massage session. (Tr. 365). When Plaintiff presented for chiropractic treatment, Dr. Rutkowski consistently reported she was in pain, with spasms, swelling, restricted range of motion, and decreased strength. (Tr. 334–39, 346–58). At times, she also presented with antalgic posture and guarding. (Tr. 338–39, 348, 358).

8

Though on occasion Dr. Rutkowski noted Plaintiff's condition was worse (Tr. 335, 352), notes generally indicated she was the same or better (Tr. 334–39, 346–47, 349–58). Sometimes Plaintiff reported pain levels as high as 8–10/10 (Tr. 335, 350, 355, 358), but usually reported her pain was a 6 or 6+/10 (Tr. 334, 336–39, 346–49, 351–55, 357) and sometimes reported pain as low as 5 or 5+/10 (Tr. 346–47, 351–54, 356–57). Plaintiff also took part in physical therapy exercises. She generally completed her exercises despite some pain and occasional dizziness (Tr. 340, 342, 344–45), but sometimes experienced a lot of soreness and at times could not complete the exercise sessions due to pain or swelling (Tr. 340–41, 343–44, 346).

On several occasions in fall 2008, Dr. Rutkowski stated Plaintiff could not return to her employment as a driver or return to light duty, alternative, modified, or transitional work due to spasms, swelling, decreased range of motion, decreased strength, and sharp, constant radiating pain in her neck and back. (Tr. 223, 305, 333). Dr. Rutkowski stated Plaintiff's gait was guarded and slow, and he said any activity aggravated her conditions. (Tr. 333). He also noted Plaintiff's therapy afforded her only temporary relief. (Tr. 333).

Opinion Evidence

Plaintiff underwent a psychological evaluation with Dr. Margaret Zerba and reported she had been married for 21 years, separated for eight years, and had two sons, ages 21 and thirteen. (Tr. 326). Her younger son lived with her and her older son visited daily. (Tr. 326). Plaintiff cried and said her husband was trying to get custody of their younger son, and she said he had been violent toward her and her children. (Tr. 326). She described her back problems and said she had no history of mental health treatment. (Tr. 327). Plaintiff was cooperative but never looked directly at Dr. Zerba. (Tr. 328). She kept her coat and scarf on during the evaluation and "held her purse in front

of her like a shield." (Tr. 328). Plaintiff appeared depressed, with a flat affect, and reported financial difficulties. (Tr. 328). She also said she struggled with anxiety in crowds or if she had to go somewhere alone. (Tr. 328). Dr. Zerba believed Plaintiff had average intelligence, and her insight and judgment seemed good. (Tr. 329). Plaintiff said her daily activities consisted of getting up with her son, getting him ready for school, watching television, calling her mother, and cooking "every now and then." (Tr. 329). She reported her children helped with shopping, cooking, and cleaning. (Tr. 329). Plaintiff explained she could not go back to work because she took narcotics for pain, further explaining she needed surgery but BWC would not pay for it. (Tr. 329). Dr. Zerba opined Plaintiff's ability to withstand the stress and pressures of daily work activity was moderately impaired. (Tr. 330).

Dr. Roseann Umana assessed Plaintiff's mental residual functional capacity (RFC), finding her mildly restricted in her activities of daily living and moderately limited in maintaining social functioning. (Tr. 300). She also found Plaintiff moderately limited in her ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 251–52). Dr. Umana thought Plaintiff's social functioning was adequate for superficial and occasional interactions. (Tr. 253). She also thought Plaintiff could remember, understand, and carry out simple instructions, as well as "many that are more complex." (Tr. 253). She found her concentration adequate, her stress tolerance limited, and opined Plaintiff could adapt to work settings with routine and predictable job duties. (Tr. 253).

Dr. Joan Williams completed a psychiatric review technique and found Plaintiff had an affective disorder and anxiety-related disorder, but these were not severe. (Tr. 232). She opined Plaintiff had mild difficulties maintaining social functioning but no difficulty in activities of daily living or maintaining concentration, persistence, or pace. (Tr. 242). Dr. Williams noted she did not fully accept the consultative examiner's report, which appeared to underestimate Plaintiff's mental capacities. (Tr. 244).

Dr. W. Jerry McCloud assessed Plaintiff's physical RFC and found Plaintiff could lift ten pounds frequently and twenty pounds occasionally; stand, walk, or sit for six hours in an eight-hour workday; and was unlimited in pushing and pulling. (Tr. 256). He found she could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and frequently balance. (Tr. 257). Dr. McCloud stated Plaintiff's allegations were partially supported. (Tr. 260). Dr. Teresita Cruz affirmed this assessment. (Tr. 374).

ALJ Hearing

Plaintiff was not represented at the hearing. (Tr. 34). The ALJ advised her of her right to be represented, and Plaintiff stated she understood her right to representation and wished to proceed without representation. (Tr. 34). Plaintiff testified she lived in a single-family two-story home with her two sons. (Tr. 37). She reported that after her alleged onset date, she worked part time in a school cafeteria, where she could sit or stand. (Tr. 38). She said she stopped working there because she could not sit and stand long enough to do the job and some days could not get out of bed. (Tr. 38). She also testified about back pain, swelling, and radiating pain. (Tr. 39). Plaintiff said some of her treatment stopped when BWC would no longer pay for her to see pain management physicians. (Tr. 41–42). Plaintiff maintained that her primary care physician Dr. Pogorelec would not release

11

her back to work. (Tr. 43). She said sitting bothered her too much for her to work a job that let her sit and alternate standing for a few minutes, later clarifying it would depend on how long she had to sit. (Tr. 45). She explained she had tried to find work she could do at home on a laptop computer so she could lay down to work. (Tr. 45–46).

When the ALJ asked Plaintiff about her ten hour car trip to Alabama, Plaintiff told him the group had driven for two hours, stopped for an hour, driven for three hours, and then stopped at a hotel before they even made it out of Ohio. (Tr. 46). She said she took Advil for pain and could no longer see any physicians because she did not have insurance. (Tr. 46–47). Plaintiff collected unemployment benefits during the period of her alleged disability, was overpaid, and stated she owed approximately $2,700. (Tr. 44–48). The ALJ asked Plaintiff, "[T]o get unemployment payments[,] don't you have to be ready, willing and able to work?" (Tr. 48). Plaintiff agreed. (Tr. 48). She stated her back problems were the only reason she could not work. (Tr. 48–49). She said she exercised with an exercise ball and resistance band, sometimes cooked meals, and did household chores if she could. (Tr. 49–50). Her chores included four loads of laundry on Sundays. (Tr. 50). Before she finished testifying, Plaintiff asked, "[I]f this is denied am I allowed to get an attorney?" and the ALJ told her she could get an attorney at any time. (Tr. 50).

The ALJ asked the VE to consider a person of Plaintiff's age, education, and past work experience, who would be limited to sedentary work, "would be able to sit frequently but occasionally stand for one to two minutes an hour just to relieve pain . . . no more than SVP 2 jobs . . . and no frequent turning of the head in any direction." (Tr. 53). The VE testified the person could work as an order clerk in the food and beverage industry, a mail sorter, and a front desk receptionist. (Tr. 54). The ALJ then asked Plaintiff if she had any questions, Plaintiff responded she did not, and

the hearing was adjourned. (Tr. 55).

ALJ Decision

       The ALJ determined Plaintiff's date last insured was March 31, 2008. (Tr. 18). She found

Plaintiff did not engage in substantial gainful activity after her alleged onset date of September 26,

2007, finding Plaintiff's part time work did not rise to the level of substantial gainful activity. (Tr.

18). The ALJ then found Plaintiff suffered from the severe impairments of back disorder and neck

disorder, but found these did not meet or medically equal an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 19–20). After considering the record, the ALJ determined Plaintiff

retained the RFC to perform sedentary work, with the following limitations: She must stand for one

to two minutes per hour to relieve pain, "is limited to performing jobs with an SVP of no more than

2 and is prevented from frequent turning of the head in any direction." (Tr. 20). The ALJ determined

the record "reveal[ed] numerous inconsistencies" adversely affecting Plaintiff's credibility,

including the fact that she received and was overpaid unemployment compensation. (Tr. 22). She

also noted Plaintiff had driven to Alabama, could complete household chores, exercised, and did not

take prescription pain medication. (Tr. 22). Based on VE testimony, the ALJ found Plaintiff could

perform work existing in significant numbers in the national economy, and therefore found her not

disabled. (Tr. 24–25). The Appeals Council denied review (Tr. 1), making the ALJ's decision the

final decision of the Commissioner.

STANDARD OF REVIEW

       In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

13

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity,

14

age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred three ways. First, she argues the ALJ improperly assessed her credibility by relying too much on (1) doctors who issued opinions based only on the claims allowed in her BWC claim and (2) her application for, receipt of, and need to repay unemployment compensation. (Doc. 15, at 10–12). Plaintiff also argues the ALJ erred at step five by posing a hypothetical that did not accurately represent her limitations, claiming attendance issues should have been incorporated into the hypothetical because Plaintiff had demonstrated she could not always show up for work. (Doc. 15, at 14–17). Finally, Plaintiff contends the ALJ failed in her duty to assist an unrepresented claimant, focusing on the ALJ's failure to obtain hospital records from the time immediately following Plaintiff's injury and on the ALJ's failure to ask more than one hypothetical question. (Doc. 15, at 12–14).

Credibility Analysis

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider

15

the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An

ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly

since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they

must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542

(6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375

F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility

determination.").

 Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an

individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a
> greater level of severity of impairment than can be shown by the objective medical
> evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of
> evidence, including the factors below, that the adjudicator must consider in addition
> to the objective medical evidence when assessing the credibility of an individual's
> statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other
> symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual
> takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief
> of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain
> or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes
> every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and
> restrictions due to pain or other symptoms.

16

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Plaintiff contends the ALJ erred assessing her credibility because she relied too much on Plaintiff's BWC doctor reports – which did not consider her disc herniations – and on Plaintiff's history of applying for, receiving, and being overpaid unemployment compensation. But Plaintiff ignores that these were only part of the overall picture the ALJ considered in discrediting her. The ALJ also considered objective medical findings, MRI results, inconsistencies between Plaintiff's testimony alleging disabling pain and function reports indicating she exercised and completed household chores, her ten hour car trip to Alabama, and the fact that she only took over the counter medication. (Tr. 21–22). The ALJ also correctly stated the law with regard to unemployment benefits, explicitly writing that "although not a basis for denial, [applying for and receiving unemployment benefits] certainly erode[d] her credibility considerably." (Tr. 22).[1] She considered the evidence and did not err finding that, as part of the totality of the circumstances, Plaintiff's history with unemployment compensation damaged her credibility.

Substantial evidence supports the ALJ's adverse credibility determination. On several occasions, Plaintiff said she was feeling well or was better (Tr. 249, 269, 273, 334, 347, 352–53, 357). She frequently presented in no acute distress. (Tr. 278, 285, 307, 317, 368). Plaintiff tolerated

---

1. *See* (Doc. 15-1) (*Social Security Memorandum: Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits – Reminder* ("[A]pplication for unemployment benefits is evidence . . . the ALJ must consider together with all of the medical and other evidence. . . . [T]he fact that a person has, during his or her alleged period of disability, sought employment at jobs with physical demands in excess of the person's alleged limitations would be a relevant factor that an ALJ should take into account".)).

17

range of motion testing and had normal range of motion on multiple occasions, normal or only mildly diminished strength, normal gait, normal reflexes, normal sensation, and no neurological deficit. (Tr. 247, 267–68, 272–73, 279, 286, 318, 368). After receiving epidural steroid injections, Plaintiff's condition improved. (Tr. 282, 289). She generally completed her physical therapy exercises despite pain and told Dr. Rutkowski she had not returned to work because her employer could not offer her a light duty position. (Tr. 284, 340, 342, 344–45). Further, despite allegedly disabling pain, Plaintiff's testimony and reports showed she could care for her son, exercise, and complete household chores in a two-story home, including cooking, washing dishes, doing four loads of laundry each week, vacuuming, and ironing. (Tr. 37, 49–50, 179–81, 284).

In addition to these activities, Plaintiff spent ten hours sitting in a car during a trip to Alabama. (Tr. 46, 272). Plaintiff attempted to minimize the significance of this car trip by protesting that she drove for two hours, stopped for an hour, drove for three hours, and then stopped for the night. (Tr. 46). However, even taking the stops into account, the trip still showed Plaintiff could sit for multiple hours in the car for a trip to Alabama.  This is inconsistent with Plaintiff's other statements, particularly her statements that she left her part-time job because alternating between sitting and standing for three hours a day was too much for her. (*See* Tr. 38). Plaintiff also inconsistently reported the reason she was not working, at times indicating it was because her employer did not have light duty positions available, because she had been laid off, or because she took narcotics, and at the hearing she even appeared to suggest she might be able to work a sedentary job but that it would merely depend on how long she had to sit. (Tr. 45, 269, 284, 329).

The ALJ considered objective medical evidence, Plaintiff's own testimony, and her reports that she could exercise and complete activities of daily living in addition to her application for

18

unemployment compensation, the BWC doctor reports, and her part time job. This substantial evidence supports the ALJ's conclusion and therefore she did not err in finding Plaintiff less than credible.

Step Five Hypothetical

Once an ALJ has determined a plaintiff cannot perform her past relevant work, the burden shifts to the Commissioner at step five to show there are other jobs in significant numbers in the economy the plaintiff can perform, consistent with her RFC, age, education, and work experience. *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). The Commissioner may meet this burden by reference to the grids, unless the plaintiff suffers nonexertional limitations that significantly limit the range of work permitted by her exertional limitations. *Id. See also Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). If a plaintiff has exertional *and* nonexertional impairments, the ALJ cannot rely solely on the grids. *Santilli v. Astrue*, 2012 WL 609382, *3 (N.D. Ohio 2012).

To meet the burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical

19

should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff urges the Court to find the ALJ erred because she asked only one hypothetical and did not include a limitation based on attendance problems, suggesting Plaintiff established she "could not always show up for work." (Doc. 15, at 15). Thus, Plaintiff believes the ALJ should have included a hypothetical asking the VE about the effect multiple absences per month would have on a person's employability. However, an ALJ can properly decide not to include certain limitations into her examination of the VE because she need only include limitations she accepts as credible. *Casey*, 987 F.2d at 1235; *Justice v. Comm'r of Soc. Sec.*, 2013 WL 645957, * 5 (6th Cir. 2013); *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 866 (6th Cir. 2011).

The ALJ did not err by failing to accept as credible the notion that Plaintiff would frequently miss work. First, the state reviewing psychologist specifically found no evidence showing Plaintiff was limited in her ability to maintain regular attendance and be punctual within customary tolerances. (Tr. 251). Further, though Plaintiff stated she left her part-time job because she sometimes could not get out of bed, this was not credible and was undermined by her statements that every day she woke up, exercised, and got her son ready for school. (Tr. 180, 329). In short, the only evidence Plaintiff would have difficulty maintaining attendance was her own statement that she had difficulty with it, and the ALJ did not err finding her not credible. The ALJ included all the limitations she accepted as credible in the hypothetical posed to the VE and thus did not err in relying on VE testimony at step five.

20

ALJ's Duty to Develop the Record

Due to the non-adversarial nature of Social Security benefits proceedings, an ALJ has a duty to develop the record. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983). The Sixth Circuit has emphasized this duty is particularly important when a claimant acts *pro se*. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). In *Lashley*, the Sixth Circuit explained:

> [A]n [ALJ's] . . . basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him." . . . To satisfy this special duty[,] the [ALJ] . . . must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." . . . He must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.

*Id.* at 1051–52 (citations omitted). The duty to develop the record is balanced, however, with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)). Although the Court must "scrutinize the record with care" where the claimant appears before the ALJ without counsel, the lack of counsel does not automatically result in reversal. *Lashley*, 708 F.2d at 1052. In determining whether it is necessary to remand for clarification of the record, the Court is guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice. *See Brown v. Shalala*, 44 F. 3d 931, 935-36 (11th Cir. 1995).

Here, Plaintiff argues the ALJ had a duty to obtain the original records from her immediate post-accident emergency treatment at Euclid Hospital rather than relying on secondary sources describing the incident. (Doc. 15, at 13). The Court does not believe, though, that the lack of these hospital records revealed an evidentiary gap resulting in unfairness or clear prejudice to Plaintiff.

21

Numerous records, including Plaintiff's testimony, recited the history of Plaintiff's emergency treatment and treatment in the days following her workplace accident. Plaintiff told Dr. Levy her son took her to the emergency room, where she was x-rayed and given injections but not examined by a physician. (Tr. 246). Plaintiff reiterated this history to Dr. Pogorelec and told him the x-rays were negative. (Tr. 275). Dr. Sherman reviewed all Plaintiff's treatment records related to her accident, noting she went to the emergency room and followed up with a physician's assistant, who told her to stay off work for several days and then told her she could return to light duty. (Tr. 284). Dr. Sherman reviewed the Euclid Hospital emergency records, which he reported showed Plaintiff's initial loss of feeling and strength in her extremities had resolved by the time she was examined, an x-ray of her thoracic spine was normal, a CT scan of her cervical spine was negative except for mild reversal of the lordotic curve, and she was cleared to return to work without restrictions on October 2, 2007. (Tr. 286). As Defendant pointed out, Plaintiff has not claimed these descriptions of her treatment were inaccurate. (*See* Doc. 16, at 22). The Court therefore finds the record contained no evidentiary gap requiring the emergency records' inclusion.

Plaintiff also argues she was significantly prejudiced because the ALJ asked only one hypothetical and did not question the VE regarding absenteeism, which she claims disadvantaged her because she did not know how to cross-examine the VE. (Doc. 15, at 13–14). She relies on *Lashley*, for the proposition that the ALJ had a heightened duty to assist her in developing her claim because she proceeded *pro se*. In *Lashley*, – where the plaintiff was inarticulate, easily confused, and possessed limited intelligence, and the hearing lasted "a mere 25 minutes" – the "inarticulateness of the claimant imposed a special duty on the ALJ to be especially probing in his questioning" and the ALJ did not satisfy this because he "only superficially questioned" the plaintiff about his

22

limitations and activities. *Lashley*, 708 F.2d at 1052. In *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008), the court clarified *Lashley*'s impact, stating it means that "under special circumstances – when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures – an ALJ has a special, heightened duty to develop the record." Because the plaintiff in *Wilson* grasped the proceedings and adequately presented her case to the ALJ, there was no error. *Id.*

The ultimate burden of proving disability remained on Plaintiff. *Wilson*, 280 F. App'x at 459; *Godec v. Astrue*, 2013 WL 1156506, *11 (N.D. Ohio 2013), *adopted by* 2013 WL 1159034. The ALJ did not have a heightened duty to develop the record unless Plaintiff was without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures. *Meadows v. Astrue*, 2012 WL 5205798, *3 (N.D. Ohio 2012), *adopted by* 2012 WL 5199627. The ALJ knew Plaintiff lacked counsel and thoroughly informed her of her right to representation, only proceeding with the hearing after Plaintiff said she understood her rights and wished to continue without representation. (Tr. 34). The ALJ instructed Plaintiff to notify her if she did not understand a question, and she then thoroughly examined Plaintiff, questioning her about her daily activities, part-time job, symptoms, workplace accident, treatment, workers' compensation claim, physical limitations and abilities, her car trip to Alabama, and her unemployment compensation. (*See, e.g.,* Tr. 34–50).

The hearing lasted almost an hour, and Plaintiff's appropriate responses to the ALJ's questions suggested she understood the questions. When a plaintiff has been fully informed of her right to counsel and waived that right, has a high school education and can read and write, and the transcript demonstrates the plaintiff understood and fully participated in the hearing, the Northern

23

District of Ohio has found there is no heightened duty to establish the record imposed on the ALJ. *See Kays v. Astrue*, 2013 WL 489684, *1 (N.D. Ohio 2013), *adopting* 2013 WL 504158. Such is the case here. Plaintiff's complaint with the record is her underlying belief that more hypothetical questions should have been posed to the VE, including one that incorporated an attendance-based limitation. But though the ALJ asked the VE only one hypothetical, it is well-established that the ALJ need only include limitations she accepted as credible, and the Court has already held the ALJ did not err with the hypothetical she posed to the VE in Plaintiff's case. Substantial evidence supports the ALJ's conclusion, and she did not fail in her duty to develop the record.

CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge